UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WILLIAM C. CRAYTON,               )
                                  )
              Petitioner,         )
                                  )
         vs.                      )          No. 4:14-CV-1038 (CEJ)
                                  )
TROY STEELE,                      )
                                  )
              Respondent.         )


## MEMORANDUM AND ORDER

This matter is before the Court on the petition of William C. Crayton for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### I.    Procedural Background

Petitioner William C. Crayton is presently incarcerated at the Potosi Correctional Center pursuant to the sentence and judgment of the Circuit Court of St. Louis City.  On April 28, 2010, a jury found petitioner guilty of first-degree murder and armed criminal action.  Resp.'s Ex. A at 92; Resp.'s Ex. B at 79.  The trial court sentenced petitioner as a prior offender to concurrent terms of imprisonment of life without parole and 75 years.  Resp.'s Ex. A at 99; Resp.'s Ex. B at 80.  Petitioner appealed his conviction, and on May 3, 2011 the Missouri Court of Appeals affirmed.  State v. Crayton, 344 S.W.3d 252 (Mo. Ct. App. 2011); Resp.'s Ex. E.

Petitioner filed a timely motion for post-conviction relief pursuant to Missouri Supreme Court Rule 29.15, which the post-conviction court denied without holding an evidentiary hearing.  On June 18, 2013, the Missouri Court of Appeals affirmed the denial of post-conviction relief.  Crayton v. State, 405 S.W.3d 561 (Mo. Ct. App.

2013); Resp.'s Ex. I.  On June 4, 2014, petitioner timely filed this petition for relief pursuant to 28 U.S.C. § 2254.

## II.    **Factual Background**

The facts as found by the state courts are as follows:

Edward Wright was killed in a shooting in his home on June 11, 2008. Christopher Hughey was Wright's cousin.  Tr. 158.  Isaiah Payne is Hughey's younger brother and also was Wright's cousin.  Tr. 223–24.  On the afternoon of Wright's death, Hughey and Payne were in a house across the street from Wright's house, sitting by a double window close to the front entrance.  Tr. 159.  At one point, Hughey and Payne saw an unfamiliar person walking up to Wright's house. Tr. 161.  Payne went over to Wright's house to see who was there.

While Payne chatted and smoked cigarettes with Wright and his visitor on the porch for 20–45 minutes, he sat less than five feet from the unknown man.  Tr. 225–26, 230.  The man bummed two cigarettes from Wright while they were talking and asked Wright if he knew where he could get heroin and ammunition. Tr. 227–28.  The man also pulled a 9-millimeter pistol from the waistband of his pants and showed it to Wright during their conversation.  Tr. 229–30.  Shortly after, Wright instructed Payne to go back across the street where he was supposed to be cutting grass.  Tr. 230–31.  While Payne was across the street putting the lawn mower away, he heard four or five gunshots.  Tr. 231.  As he came around the front of the house, Payne saw the man who was on the porch with him earlier leaving Wright's house and fixing his shirt.  Tr. 232.  The man told Payne that Wright was in the bathroom, but would be out in a minute.  After hearing the gunshots, Hughey saw Wright's cousin Tamara Thomas run out of the side of the

house and into the front yard. Tr. 162. Hughey and Payne subsequently ran over to the house, opened the door, and saw Wright dead in his chair. Tr. 163, 232.

Thomas was in a bedroom in the house when Wright was killed. Tr. 108–10. She heard the voice and footsteps of another person in the house with Wright and heard the sound of approximately five gunshots. Tr. 110–12. After some time had passed, Thomas came out of the bedroom and saw her cousin dead in his chair, but she did not see the person she had heard with the victim. Tr. 113–16. An evidence technician with the St. Louis City Police found empty shell casings from a semiautomatic handgun near the victim. Tr. 90–92. A firearm and tool mark examiner with the St. Louis Metropolitan Police Department testified that at least two of the empty shell casings were fired from the same firearm. Tr. 122–23. The deputy chief medical examiner of the St. Louis City Office of Medical Examiner conducted an external examination and autopsy of Wright. Tr. 277–79. Wright had four gunshot wounds to the head and one to the right arm. The medical examiner opined that Wright had died from one of the gunshot wounds to his head. Tr. 283. A DNA analyst for the St. Louis Metropolitan Police Department crime laboratory analyzed cigarette butts found at the scene of the crime and concluded that DNA profiles from two of the cigarette butts were consistent with that of petitioner to a reasonable degree of scientific certainty. Tr. 271–73.

Heather Sabin, a homicide detective with the St. Louis Metropolitan Police Department in charge of the investigation of Wright's death, stated that she initially investigated Bobby Brandon, also known as "B.O.B.," as a suspect based on rumors in the neighborhood. Tr. 133. When she showed photographs of Brandon to Hughey and Payne and included Brandon in a live line-up, however, neither

identified Brandon as having been involved with Wright's death. Tr. 134–35, 234–35. Petitioner became a possible suspect from a combined DNA indexing system (CODIS) hit on the cigarette butts found at the scene. Tr. 135–36, 154. After the CODIS hit, Sabin included petitioner's photograph in a photo spread to show Hughey and Payne. Tr. 135–36. Both witnesses independently identified petitioner as the person he saw at the scene on the date of the incident. Tr. 137, 235–37.

In making his photo identification, Hughey stated that petitioner looked like the same person he saw based on his facial structure and complexion. However, Hughey was only 50% sure because he was across the street at the time of the incident. Tr. 137, 198. Payne stated that he was 100% sure of his photo identification, because he had had a conversation with petitioner on the date of the incident. Tr. 138. Sabin then conducted a live line-up containing petitioner at the St. Louis Justice Center. Tr. 138. Hughey picked petitioner out of the line-up in a matter of seconds and stated that, based on his size, build, and stature, he was pretty sure petitioner was the person involved with the incident. Tr. 138–39. Payne immediately identified petitioner and stated that he had sat on the front porch of Wright's house and had a conversation with petitioner for several minutes on the date of the incident, during which he smoked cigarettes with petitioner. Tr. 139. Petitioner was taken into custody and charged with the death of Wright in early November 2008. Tr. 155; Resp.'s Ex. B at 12.

Petitioner testified on his own behalf that he had been a childhood friend of Wright's and occasionally met up with him to sell him marijuana after moving away from the neighborhood. Tr. 297–98. He stated that he was not with Wright on June 11, 2008 and neither shot Wright nor saw him get shot. Tr. 299. He also

stated that he had never seen Hughey or Payne before the trial. Tr. 304. He could not recall the last time he had been in Wright's home. Tr. 301–06.

Additional facts will be included as necessary to address petitioner's claims.

### III.  <u>Legal Standard</u>

When a claim has been adjudicated on the merits in state court proceedings, habeas relief is permissible under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), only if the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

A state court's decision is "contrary to" clearly established law if "it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005). "The state court need not cite or even be aware of the governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" <u>Brown v. Luebbers</u>, 371 F.3d 458, 461 (8th Cir. 2004) (<u>citing</u> <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002)). "In the 'contrary to' analysis of the state court's decision, [the federal court's] focus is on the result and any reasoning that the court may have given; the absence of reasoning is not a barrier to a denial of relief." <u>Id.</u>

A decision involves an "unreasonable application" of clearly established law if "the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner," Payton, 125 S. Ct. at 1439; Williams v. Taylor, 529 U.S. 362, 405 (2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 406. "Federal habeas relief is warranted only when the refusal was 'objectively unreasonable,' not when it was merely erroneous or incorrect." Carter v. Kemna, 255 F.3d 589, 592 (8th Cir. 2001) (quoting Williams, 529 U.S. at 410–11).

## IV.    Discussion

Petitioner presents eight claims for relief in his petition:  (1) the trial court committed error in overruling his Batson challenges; (2) the trial court erred in denying his motion for judgment of acquittal and motion for new trial, because the evidence presented at trial was insufficient as a matter of law to prove the element of deliberation as required for a conviction of murder in the first-degree; (3) the evidence at trial was also insufficient to establish his identity as the killer; (4) the trial court erred in granting the prosecution's motion *in limine* to exclude reference to the fact that no fingerprint test was sought from the projectile casings found near the victim although fingerprints were taken from the crime scene; (5) his trial counsel was ineffective for failing to call an eyewitness identification expert; (6) trial counsel was ineffective when advising him on testifying at trial; (7) his appellate counsel was ineffective by failing to raise on appeal a claim pertaining to

the trial court's admission of a gruesome photograph; and (8) trial counsel was ineffective for failing to call Makayla Webster to testify as an alibi witness.

## A.    Ground One: __Batson__ Challenges

Petitioner first argues that the trial court committed error when it overruled his Batson challenges at trial and on his motion for a new trial.  A Batson objection requires a three-step process:  (1) the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race; (2) if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question; and (3) the court must determine whether the defendant has carried his burden of proving purposeful discrimination.  Batson v. Kentucky , 476 U.S. 79, 96–98 (1986).

On direct review, the trial court's determination is entitled to "great deference," Id. at 98 n. 21, and "must be sustained unless it is clearly erroneous." Snyder v. Louisiana, 552 U.S. 472, 477 (2008).  On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." Felkner v. Jackson, 562 U.S. 594, 598 (2011) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).  "[D]eterminations of credibility and demeanor lie peculiarly within a trial judge's province," and "in the absence of exceptional circumstances," federal courts should "defer to the trial court."  Snyder, 552 U.S. at 477; see Taylor v. Roper, 577 F.3d 848, 855 (8th Cir. 2009) (stating that whether a peremptory strike was motivated by race is a question of fact and a state court's determination of a factual

issue is presumed correct in a federal habeas proceeding, rebutted only be clear and convincing evidence).

At the close of the voir dire examination, the prosecutor used two of his preemptory strikes against African-American venirepersons. Resp.'s Ex. A, Tr. 69. As to the first, Donovan Meads, the proffered reasons were that he was not looking at the prosecutor while he spoke, but he paid attention to defense counsel during her voir dire. Tr. 70. Furthermore, when Mr. Meads did look at the prosecutor, he smirked. The prosecutor stated that his co-counsel had independently observed the same behavior. As to Ms. Robinson, the prosecutor stated that she was behaving in the same manner as Mr. Meads, with the exception of the smirking. Tr. 74. When the prosecutor spoke during voir dire, Ms. Robinson looked away, at her nails, or at the ceiling, but she paid attention when defense counsel spoke. The prosecutor stated that he had "the gut feeling" that she would not be "particularly impartial." Tr. 74.

In response, defense counsel argued that because the prosecutor had failed to make a record of the alleged demeanor during voir dire, she could not dispute the prosecutor's characterizations or find a similarly situated panel member who was not struck. Tr. 71, 74. As to Mr. Meads, defense counsel stated that he did not appear to be "very open." However, defense counsel attributed this to Meads's demeanor, and asserted that he did not look at the prosecutor "any worse than he looked at me." Tr. 71. After defense counsel argued that the prosecutor's basis for striking these two jurors was pretextual, the prosecutor added that Ms. Robinson had multi-colored hair, which indicated a "streak of individuality" as a basis for a

preemptory strike.  Tr. 74.  The trial court overruled the <u>Batson</u> challenges and allowed both strikes.

Two weeks after the trial, defense counsel filed a motion for a new trial, reasserting petitioner's <u>Batson</u> challenges.  Resp.'s Ex. B at 72.  Prior to petitioner's sentencing, the trial court held oral argument on the motion.  Resp.'s Ex. A at 95. After allowing the attorneys an opportunity to speak, the trial court first noted that it did not have the same vantage point of the potential jurors that the prosecutor and defense counsel had during voir dire.  Second, the trial court stated that one of the components of its decision with respect to the statements made by counsel during jury selection included the "credibility or lack of credibility of the particular attorneys in terms of . . . my experience with them."  Resp.'s Ex. A at 96.  Because the trial court found the prosecutor to be credible, based on its experience, the court considered the statements made by the prosecutor in exercising his peremptory strikes regarding the way the venirepersons acted or did not react credible.  As such, the trial court stood by its previous decision on the <u>Batson</u> challenges.

Petitioner raised the <u>Batson</u> claim on direct appeal, arguing that the prosecution had failed to make a record with regard to its stated rationale pertaining to the demeanor of the venirepersons and the prosecutor's stated reasons for striking both venirepersons were pretextual for race.  Resp.'s Ex. C at 21–30.  The appellate court disagreed, stating that the prosecution was not required to raise demeanor issues during voir dire, and defense counsel had an equal opportunity to observe the demeanor of the venire panel and refute the prosecutor's characterizations.  Resp.'s Ex. E at 11–12; <u>see</u> <u>State v. Miller</u>, 162

S.W.3d 7, 16–17 (Mo. Ct. App. 2005) (recommending counsel to bring concerns of venireperson demeanor at the earliest opportunity during voir dire to make a more complete written record, but nonetheless stating that "failure to follow this suggestion does not constitute reversible error; rather, it merely complicates a fact decision that the trial court must decide").  Additionally, the appellate court found that defense counsel did not establish that the prosecution's explanation for its peremptory challenges was pretext for discrimination because she did not point to any white venirepersons who were behaving the same way.  Finally, the appellate court stated that a trial court may properly consider its past experiences with the attorneys in evaluating the plausibility of an attorney's <u>Batson</u> arguments.

"Step three of the <u>Batson</u> inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge."  <u>Snyder</u>, 552 U.S. at 477 (internal citations, quotations and brackets omitted).  While the trial court's firsthand observations of a juror's demeanor is of great importance when a peremptory challenge invokes that juror's demeanor, <u>see</u> <u>Snyder</u>, 552 U.S. at 477, the Supreme Court has stated that "neither [<u>Batson</u> or <u>Snyder</u>] held that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror's demeanor."  <u>Thaler v. Haynes</u>, 559 U.S. 43, 47 (2010) (per curiam).  Rather, the Supreme Court reiterated that "the best evidence of the intent of the attorney exercising a strike is often that attorney's demeanor."  <u>Id.</u> at 49 (citing <u>Hernandez v. New York</u>, 500 U.S. 352, 365 (1991)).

Here, the trial court considered the prosecutor's race-neutral explanations credible based on the prosecutor's attested observations of the potential jury members' demeanor and the trial court's experience with the prosecutor and his demeanor. The appellate court also reviewed the record at some length in providing its rationale for upholding the trial court's findings. Based on a review of the record below, the Court finds that the state court decisions did not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts. No exceptional circumstances or clear and convincing evidence exists for the Court to find otherwise. Accordingly, petitioner is not entitled to relief on ground one.

### B. Grounds Two and Three: Sufficiency of the Evidence at Trial

In grounds two and three, petitioner argues that the evidence presented at trial was insufficient to prove the element of deliberation for the charge of murder in the first-degree and to establish his identity as the killer. In reviewing the sufficiency of the evidence to support a criminal conviction, the court asks whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). In applying this standard, the scope of review "'is extremely limited . . . . We must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and we must defer to that resolution.'" Whitehead v. Dormire, 340 F.3d 532, 536 (8th Cir. 2003) (quoting Sexton v. Kemna, 278 F.3d 808, 814 (8th Cir. 2002)). "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos

v. Smith, 132 S. Ct. 2, 3–4 (U.S. 2011).  On habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  Id. at 4 (quoting Renico, 559 U.S. at 773).

At the close of the state's case, defense counsel filed a written motion for judgment of acquittal and orally argued that the prosecution had failed to prove the element of deliberation.  Resp.'s Ex. B at 51; Resp.'s Ex. A, Tr. 293.  The trial court overruled her motion.  Defense counsel renewed her motion for judgment of acquittal at the close of all of the evidence, which the trial court again overruled.  Tr. 332.  Petitioner raised the issue of sufficiency of the evidence as it related to the element of deliberation and his identity as the shooter in his motion for a new trial.  Resp.'s Ex. B at 75.  Petitioner also raised both of these claims in his direct appeal.  Resp.'s Ex. C at 30–37.

As to the evidence presented at trial pertaining to the element of deliberation, the appellate court first noted that deliberation is defined as "cool reflection for any length of time no matter how brief" and may be inferred from the circumstances.  Resp.'s Ex. E at 13; Mo. Rev. Stat. § 565.002(3).  The appellate court found that the record demonstrated "ample inferential evidence of deliberation."  Resp.'s Ex. E at 13.  Petitioner brought a gun to Wright's house, shot Wright in the head four times, and did not call the police or seek medical help, but instead attempted to delay the discovery of Wright's body by telling Payne that Wright was using the bathroom.  The Court finds that this summary does not

constitute an objectively unreasonable determination of the facts based on the evidence presented at trial.

As to the evidence pertaining to petitioner's identity as the shooter, the appellate court noted that the crux of petitioner's argument appeared to be based on the fact that no witness made an in-court identification of petitioner. Resp.'s Ex. E at 15. In addressing that argument, the appellate court wrote that an in-court identification is not mandatory where the witnesses' total testimony sufficiently identifies the defendant as the person who committed the crime. See State v. Gaines, 316 S.W.3d 440, 455 (Mo. Ct. App. 2010) ("The evidence at trial must show defendant was the person who committed the crime, but an in-court identification is not always required. The procedure used at trial to identify the defendant is left to the discretion of the trial court. Each case must be examined on its own facts looking at the totality of the circumstances.") (quoting State v. Baker, 23 S.W.3d 702, 708 (Mo. Ct. App. 2000)).

At trial, testimony established that Payne spoke and smoked cigarettes with a man at Wright's house on June 11, 2008. Homicide detective Sabin testified that both Hughey and Payne identified the man they saw at Wright's house as petitioner in a photo spread and at a live line-up. Furthermore, Payne testified that petitioner was carrying a handgun and, after hearing four or five gunshots, he saw petitioner leaving Wright's house. Finally, petitioner's DNA was found on cigarette butts found in Wright's home, although petitioner denied having been there recently. Thus, the appellate court concluded that the record and inferences sufficiently established that petitioner was the person who committed the crimes. Based on the Court's review of the record from the trial proceeding, these findings and

conclusions are not objectively unreasonable. As such, petitioner is not entitled to relief on grounds two or three.

### C. Ground Four: Exclusion of Evidence

In the fourth ground, petitioner asserts that the trial court erred in excluding reference at trial to the fact that although fingerprints were taken from the crime scene, no fingerprint test was sought from the projectile casings found near the victim. Petitioner raised this claim on direct appeal. Because evidentiary rulings in state court are governed by state law, the only question for this Court's review is whether the evidentiary ruling constituted a constitutional violation. See Parker v. Bowersox , 94 F.3d 458, 460 (8th Cir. 1996). "A state court's evidentiary rulings can form the basis for federal habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." Id. "Rulings on the admission or exclusion of evidence in state trials rarely rise to the level of a federal constitutional violation." Abdi v.Hatch, 450 F.3d 334, 338 (8th Cir. 2006).

Because petitioner did not preserve this claim for appeal, the appellate court reviewed the claim for plain error. Resp.'s Ex. E at 16. The appellate court summarized the controlling legal standard, stating that the prosecution is not required to gather and present all physical evidence possibly relevant to its case-in-chief. State v. Hopson, 168 S.W.3d 557, 564 (Mo. Ct. App. 2005). As such, when the prosecution does not investigate and present a particular type of physical evidence, the defense cannot argue an adverse inference from that failure. Id. However, when the prosecution does search for particular physical evidence but

does not find it, then the defense may argue a negative inference.  <u>State v. Slagle</u>, 206 S.W.3d 404, 412 (Mo. Ct. App. 2006).

Here, petitioner does not assert that the prosecution checked for but failed to find fingerprints on the shell casings found near the victim's body.  Rather, the prosecution searched other surfaces for fingerprints, including the door frame, cigarette butts and a beverage container.  The appellate court determined that only if the prosecution checked the shell casings for fingerprints and found none could the exception to the adverse inference apply.  Petitioner has presented no evidence of conspicuous prejudice or fatal infection of the fairness of the trial based on the exclusion of this evidence at trial.  Because the state court's determination does not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts in the record, petitioner is not entitled to relief on his claim in ground four.

### D.  Grounds Five through Eight:  Ineffective Assistance

Petitioner's four remaining grounds for relief involve allegations of ineffective assistance of counsel.  To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced thereby.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  With respect to the first <u>Strickland</u> prong, there exists a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance.  <u>Id.</u> at 689.  In order to establish prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to

undermine confidence in the outcome." Id. at 694; see also Paulson v. Newton Corr. Facility, 773 F.3d 901, 904 (8th Cir. 2014) ("Merely showing a conceivable effect is not enough; a reasonable probability is one sufficient to undermine confidence in the outcome.") (quoting Worthington v. Roper, 631 F.3d 487, 498 (8th Cir. 2011)).

"Taken together, AEDPA and Strickland establish a 'doubly deferential standard' of review." Williams v. Roper, 695 F.3d 825, 831 (8th Cir. 2012) (quoting Cullen v. Pinholster, 131 S. Ct. 1388, 1410 (U.S. 2011)).

> First, under Strickland, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on whether it is "reasonably likely" that the result would have been different absent the errors. Strickland, 466 U.S. at 696 . . . . To satisfy Strickland, the likelihood of a different result must be "substantial, not just conceivable." [Harrington v. Richter, 131 S. Ct. 770, 792 (U.S. 2011).] Under AEDPA, [federal courts] must then give substantial deference to the state court's predictive judgment. So long as the state court's decision was not "contrary to" clearly established law, the remaining question under the "unreasonable application" clause of § 2254(d) is whether the state court's determination under the Strickland standard is unreasonable, not merely whether it is incorrect. Id. at 785. This standard was meant to be difficult to meet, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 786.

Id. at 831–32.

### Eyewitness Identification Expert

In his fifth claim for relief, petitioner asserts that trial counsel was ineffective for failing to call an eyewitness identification expert to testify at trial. Petitioner raised this claim below in his motion for post-conviction relief. Resp.'s Ex. F at 21–59. The post-conviction motion court denied this claim, stating that expert testimony as to the reliability of eyewitness testimony is generally inadmissible, particularly when the testimony is specific to actual witnesses at trial since it

invades the province of the jury.  Resp.'s Ex. F at 65–66; <u>State v. Whitmill</u>, 780 S.W.2d 45, 47 (Mo. banc 1989) ("Generally, expert testimony is inadmissible if it relates to the credibility of witnesses because this constitutes an invasion of the province of the jury.").  Furthermore, the post-conviction motion court found that the defense had other available safeguards, such as cross-examination of the eyewitnesses, closing argument, and limiting instructions to the jury.  <u>See</u> <u>State v. Ware</u>, 326 S.W.3d 512, 528–29 (Mo. Ct. App. 2010) (discussing the trial safeguards that ensure a defendant has an adequate opportunity to inform the jury of the difficulties inherent in eyewitness identification).  In reviewing the claim, the post-conviction appellate court agreed for the same reasons provided by the motion court.  Resp.'s Ex. I at 4–6.

At trial, the prosecution called two eyewitnesses who identified petitioner as the shooter.  Resp.'s Ex. A, Tr. 158–265.  Petitioner's trial counsel cross-examined both witnesses at length regarding their opportunity to view the man they saw and the certainty of their identifications of petitioner.  Tr. 169–223, 244–65.  Defense counsel also argued the unreliability of these witnesses' identifications in closing argument.  Tr. 343–60.  Finally, Instruction No. 1 given to the jury at the close of evidence described the various factors the jury should consider in determining the credibility of witness testimony, including the ability and opportunity of the witness to observe and remember any matter about which testimony was given.  Resp.'s Ex. B at 57–58.

The state courts' determination of petitioner's claim in ground five involves neither an unreasonable application of the <u>Strickland</u> standard, nor an unreasonable determination of the facts.  Furthermore, petitioner has not shown that trial

counsel's conduct fell outside the wide range of professionally reasonable assistance or that the result of the proceeding would have been different if an eyewitness expert had testified.  See <u>Rodela-Aguilar v. United States</u>, 596 F.3d 457, 462 (8th Cir. 2010) ("A claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what a scientific expert would have stated' at trial in order to establish <u>Strickland</u> prejudice.").  As such, petitioner is not entitled to relief on ground five.

### **Petitioner's Testimony at Trial**

In his sixth ground for relief, petitioner asserts that his trial counsel was ineffective when advising him on testifying at trial, because his testimony allowed the prosecution to present prejudicial, conflicting rebuttal evidence.  Petitioner raised this claim in his motion for post-conviction relief.  Resp.'s Ex. F at 43–49.  The post-conviction motion court denied petitioner relief on this claim, because petitioner did not allege that he was forced to testify, but rather had followed counsel's advice based on her trial strategy.  Resp.'s Ex. F at 69–70.  The motion court found that trial counsel's valid strategic reason for advising petitioner to testify was to explain the presence of his DNA on a cigarette butt found at the crime scene.  The post-conviction appellate court agreed, describing the opportunity for petitioner to explain the presence of his DNA on cigarette butts found at the crime scene as "a very important strategic reason to call [petitioner] to testify." Resp.'s Ex. I at 8.

During his testimony, petitioner stated that he knew Wright from the neighborhood recreation center when he was growing up and since then occasionally saw him on the street Wright lived to sell him marijuana.  Resp.'s Ex.

A, Tr. 297–99.  Petitioner testified that he was not with Wright on the date he was shot and he neither saw the shooter nor shot Wright.  Petitioner stated that he smoked cigarettes and may have smoked with or around Wright before.  On cross-examination by the prosecutor, petitioner stated that he last had been to Wright's house twice in 2008.  Tr. 305–06.

During the prosecution's presentation of rebuttal evidence, detective Sabin first testified that she went to the address at which petitioner testified he lived, but she did not locate him there.  Resp.'s Ex. A, Tr. 312–13.  Also, when she interviewed petitioner during her investigation of Wright's death, Sabin testified that petitioner told her he did not know where Wright lived, he had never been to Wright's house, and he had not seen Wright in seven or eight years.  Tr. 318–19, 323–25.  On cross-examination, defense counsel established that petitioner had told Sabin that he knew Wright from seven to eight years ago, not that he had not seen Wright in seven or eight years.  Tr. 326–28.

Prior to petitioner's testimony, the prosecution had presented evidence that his DNA was found on cigarette butts collected from the scene of the crime.  Tr. 271–73.  During closing argument, defense counsel referenced petitioner's testimony to explain how his DNA could have been on the cigarette butts from a date prior to Wright's death.  Tr. 344–45.  She also explained how petitioner's testimony was not inconsistent with the prosecution's rebuttal evidence and extolled petitioner for choosing to testify at trial.  Tr. 352–54, 358–59.

The state court decisions did not involve an unreasonable application of the Strickland standard or an unreasonable determination of the facts based on the evidence presented at trial.  Moreover, trial counsel's advice to petitioner to testify

falls within the limits of reasonable trial strategy—that strategy being to explain the presence of petitioner's DNA at the scene of the crime as evidenced by her closing argument. Finally, even assuming that petitioner should not have testified, he has not shown actual prejudice by his counsel's advice. In her cross-examination of the prosecution's rebuttal witness and during closing argument, trial counsel clarified the purported inconsistency between petitioner's testimony at trial and his statements during the detective's investigation. Accordingly, petitioner is not entitled to relief on ground six.

## Admission of Photographs at Trial

In his seventh ground for relief, petitioner argues that his appellate counsel was ineffective by failing to contest the trial court's admission of a gruesome photograph of the victim's wounds on appeal. At the close of evidence at trial, defense counsel objected to the admission of four photographs into evidence as duplicative, irrelevant, and inflammatory due to their gruesome nature. Tr. 286–87. The prosecutor withdrew one of the photographs, but the other three were admitted into evidence. Tr. 288–89. With regard to the admissibility of one of the photographs in particular, Exhibit 10, the prosecutor argued that it uniquely showed the nature and location of the wounds to the left side of the victim's head. Tr. 287–88. In the motion for a new trial that trial counsel filed, she disputed the relevance of Exhibit 10, a photograph of the left side of the victim's face, and argued that the trial court erred in allowing its admission. Resp.'s Ex. B at 74. On direct appeal, appellate counsel raised four grounds for relief, but did not reassert this claim. Resp.'s Ex. C. Petitioner raised this claim in his motion for post-conviction relief. Resp.'s Ex. F at 49–53.

The post-conviction motion court denied the claim, stating that trial courts have broad discretion in the admission of photographs and a photograph should not excluded even if it is inflammatory if it is relevant.  Resp.'s Ex. F at 71.  The motion court found that the location of the victim's wounds was relevant to the element of deliberation for the murder charge and the locations were highlighted by the prosecutor during his closing argument.  Appellate counsel was not ineffective for not raising this issue on appeal, the motion court concluded, because the admission of the photograph at issue into evidence could not have resulted in such a miscarriage of justice to warrant a reversal of his convictions.  Id. at 72.  The post-conviction appellate court agreed, finding that the photograph was relevant and that this claim would not have resulted in a reversal of the convictions.  Resp.'s Ex. I at 12–13; see State v. Dorsey, 318 S.W.3d 648, 657 (Mo. banc 2010) (stating that "gruesome photographs are relevant and admissible if they:  (1) show the nature and location of wounds; (2) enable jurors to better understand the testimony at trial; and (3) aid in establishing an element of the state's case.").

The state court decisions below did not involve an unreasonable application of Strickland or an unreasonable determination of facts based on the evidence presented at trial.  See Smith v. Robbins, 528 U.S. 259, 289 (2000) (applying Strickland to a claim of ineffective assistance of appellate counsel).  Additionally, petitioner has not shown that appellate counsel's performance fell outside the wide range of professionally reasonable assistance.  See Jones v. Barnes, 463 U.S. 745, 751 (1983) ("Neither Anders nor any other decision of this Court suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter

of professional judgment, decides not to present those points."); see also Smith v. Robbins, 528 U.S. 259, 288 (2000) (citing Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986) for the principle that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome").  Thus, petitioner is not entitled to relief on ground seven.

## Alibi Witnesses

In his final ground for relief, petitioner asserts that his trial counsel was ineffective for failing to call Makayla Webster to testify as an alibi witness. Specifically, petitioner asserts that Webster would have testified that she was present with petitioner "as the police investigation developed in this case, and for a period of time before that."  Pet. at 19 [Doc. #1].  Petitioner asserted this claim in his motion for post-conviction relief.  Resp.'s Ex. F at 37–43.  The post-conviction motion court denied the claim, finding that Webster's testimony would not have unqualifiedly supported petitioner because she did not provide a clear alibi.  Resp.'s Ex. F at 68.  Even if she was with petitioner when the police investigation was underway, enough time had elapsed between Wright's murder and the investigation for petitioner to have reached her house six miles away.  Furthermore, when petitioner testified on his own behalf, the motion court noted that petitioner denied being at Wright's house at the time of the murder, but he did not say he was with Webster.  The post-conviction appellate court agreed with the motion court, concluding that Webster's testimony as alleged would not have provided petitioner with an alibi because it did not account for his whereabouts at the time of the actual shooting and did not foreclose the possibility that petitioner was the shooter. Resp.'s Ex. I at 10.

The state court determinations below did not involve an unreasonable application of the <u>Strickland</u> standard or an unreasonable determination of the facts based on the evidence presented at trial. Additionally, petitioner has not shown that trial counsel's assistance was ineffective. "To establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony 'would have probably changed the outcome of the trial.'" <u>Hadley v. Groose</u>, 97 F.3d 1131, 1135 (8th Cir. 1996) (quoting <u>Stewart v. Nix</u>, 31 F.3d 741, 744 (8th Cir. 1994)). In considering the value of the testimony of uncalled witnesses in an ineffective assistance claim, the Eight Circuit has stated it considers "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." <u>Armstrong v. Kenna</u>, 590 F.3d 592, 596 (8th Cir. 2010) (quoting <u>McCauley-Bey v. Delo</u>, 97 F.3d 1104, 1106 (8th Cir. 1996)). Petitioner has not shown that Webster would have testified, explained specifically what Webster would testified to enable the court to consider the value of her testimony, or proven that her testimony would have overcome the evidence presented by the prosecution since it did not unequivocally establish an alibi for petitioner as alleged. As such, petitioner is not entitled to relief on ground eight.

## V.     Conclusion

For the reasons discussed above, the Court concludes that petitioner has failed to establish that he is entitled to relief based on state court proceedings that were contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence

presented in the state court proceedings.  28 U.S.C. § 2254(d).  Petitioner has also failed to make a substantial showing of the denial of a constitutional right. Therefore, the Court will not issue a certificate of appealability.  See Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997).

A judgment in accordance with this Memorandum will be entered separately.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 13th day of April, 2017.